1  PHILLIP A. TALBERT
   United States Attorney
2  JOSEPH B. FRUEH
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA  95814
4  E-mail:      joseph.frueh@usdoj.gov
   Telephone: (916) 554-2702
5  Facsimile:  (916) 554-2900

6  Attorneys for Defendant
   UNITED STATES OF AMERICA

7

8

9                  IN THE UNITED STATES DISTRICT COURT

10                EASTERN DISTRICT OF CALIFORNIA

11

12  PETER L. FEAR, in his capacity as the Trustee       No. 2:18-cv-02333-KJM-DB
    of the Chapter 7 Bankruptcy Estate of Orlonzo
13  Hedrington,                                         **MEMORANDUM OF POINTS AND**
                                                        **AUTHORITIES IN SUPPORT OF**
14                            Plaintiff,                **DEFENDANT UNITED STATES OF**
                                                        **AMERICA'S MOTION TO DISMISS OR, IN**
15             v.                                       **THE ALTERNATIVE, FOR SUMMARY**
                                                        **JUDGMENT**
16  UNITED STATES OF AMERICA; DOES 1
    through 50, inclusive,
17
                              Defendants.
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.    Introduction ......................................................................................................1

II.   Background ........................................................................................................1

      A.    Hedrington's Surgery and Tort Claim against the United States.........................1

      B.    The Investigation of Hedrington's Alleged Sexual Assault ...............................2

      C.    Hedrington's Litigation Against the United States...........................................4

            1.    *Fear v. United States*, E.D. Cal. No. 2:18-cv-02333-KJM-DB ...................4

            2.    *Hedrington v. United States, et al.*, E.D. Cal. No. 2:21-cv-00414-KJM-DB .........5

            3.    Hedrington's Testimony in *Fear v. United States* .............................5

            4.    Hedrington's Mental Evaluation in *Fear v. United States*...................7

III.  Legal Standards.................................................................................................9

      A.    Rule 12(b)(1)...........................................................................................9

      B.    Rule 56 ...................................................................................................10

IV.   Argument ...........................................................................................................11

      A.    This action must be dismissed for lack of subject-matter jurisdiction.............11

            1.    The allegations giving rise to this case are too vague and delusional to invoke federal subject-matter jurisdiction. ...................................11

            2.    The alleged wrongful conduct falls outside the scope of federal employment......12

            3.    The allegations giving rise to this case fall within the intentional-tort exception to the FTCA's waiver of sovereign immunity.........................14

            4.    Any claim of negligent supervision is barred by the discretionary-function exception to the FTCA's waiver of sovereign immunity.........................15

                  a.    Plaintiff fails to identify any specific and mandatory requirement that DGMC violated in supervising its employees. ...................15

                  b.    Decisions regarding the supervision of federal employees are susceptible to policy analysis...................................................16

      B.    Even if this Court had jurisdiction, summary judgment must be granted in favor of the United States because this action is barred by res judicata. ...........16

      C.    Even if this Court had jurisdiction, and even this action were not barred by res judicata, summary judgment must be granted in favor of the United States because there is insufficient evidence to support any negligence claim.............18

V.    Conclusion ........................................................................................................19

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## **Federal Cases**

*Ard v. F.D.I.C.*,
        770 F. Supp. 2d 1029 (C.D. Cal. 2011) ................................................................. 15

*Brown v. Rodarmel*,
        No. 10-293, 2013 WL 1249023 (M.D. Pa. Mar. 27, 2013) ................................. 12

*Cusano v. Klein*,
        264 F.3d 936 (9th Cir. 2001) ................................................................................. 4

*Devereaux v. Abbey*,
        263 F.3d 1070 (9th Cir. 2001) (en banc) ............................................................. 10

*Doe v. Holy See*,
        557 F.3d 1066 (9th Cir. 2009) (per curiam) ........................................................ 15

*Fairbank v. Wunderman Cato Johnson*,
        212 F.3d 528 (9th Cir. 2000) ........................................................................... 10, 18

*Hallett v. U.S. Dep't of Navy*,
        850 F. Supp. 874 (D. Nev. 1994) .......................................................................... 14

*Hawkins v. Risley*,
        984 F.2d 321 (9th Cir. 1993) ................................................................................ 17

*In Re Apple Computer Sec. Litig.*,
        886 F.2d 1109 (9th Cir. 1989) .............................................................................. 10

*In re Barkats*,
        No. 14-00053, 2019 WL 3934799 (Bankr. D.D.C. Aug. 16, 2019) ..................... 17

*In re Oracle Corp. Sec. Litig.*,
        627 F.3d 376 (9th Cir. 2010) ................................................................................ 10

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
        542 F.3d 290 (2d Cir. 2008) ........................................................................... 10, 18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
        475 U.S. 574 (1986) .............................................................................................. 10

*Moralez v. Vilsack*,
        No. 16-282, 2017 WL 4652730 (E.D. Cal. Oct. 17, 2017) ................................. 4, 5

*Norton v. FBI*,
        No. 08-1829, 2010 WL 431367 (C.D. Cal. Jan. 28, 2010) .................................. 11

*Nurse v. United States*,
        226 F.3d 996 (9th Cir. 2000) ........................................................................... 15, 16

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

ii

*Owens v. Kaiser Found. Health Plan, Inc.*,
    244 F.3d 708 (9th Cir. 2001) ................................................................. 16, 17

*O'Brien v. U.S. Department of Justice*,
    927 F. Supp. 382 (D. Ariz. 1995) ................................................................. 11

*Pelletier v. Fed. Home Loan Bank*,
    968 F.2d 865 (9th Cir. 1992) ................................................................. 12

*River City Markets, Inc. v. Fleming Foods W., Inc.*,
    960 F.2d 1458 (9th Cir. 1992) ................................................................. 10

*Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1*,
    824 F.3d 1161 (9th Cir. 2016) ................................................................. 17

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004) ................................................................. 10

*Sheehan v. United States*,
    896 F.2d 1168 (9th Cir. 1993) ................................................................. 14

*Sierra Switchboard Co. v. Westinghouse Elec. Corp.*,
    789 F.2d 705 (9th Cir. 1986) ................................................................. 17

*St. Clair v. City of Chico*,
    880 F.2d 199 (9th Cir. 1989) ................................................................. 9

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ................................................................. 11

*Summers v. Teichert & Son, Inc.*,
    127 F.3d 1150 (9th Cir. 1997) ................................................................. 10, 18

*Taylor v. United States*,
    No. 13-371, 2013 WL 3223420 (C.D. Cal. June 25, 2013) ................................................................. 12, 14

*Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*,
    594 F.2d 730 (9th Cir. 1979) ................................................................. 10

*United States v. Gaubert*,
    499 U.S. 315 (1991) ................................................................. 15

*Vickers v. United States*,
    228 F.3d 944 (9th Cir. 2000) ................................................................. 16

*West v. United States*,
    No. 15-1243, 2016 WL 1576382 (C.D. Cal. Apr. 11, 2016) ................................................................. 16

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) ................................................................. 9

*Wilson v. N.Y. City Police Dep't*,
    No. 09-2632, 2013 WL 878585 (S.D.N.Y. Feb. 6, 2013) ................................................................. 11

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

iii

**Federal Statutes**

28 U.S.C. § 1346 .......................................................................................... 1, 12

28 U.S.C. § 2680 ........................................................................................ 14, 15

**Federal Rules**

Fed. R. Civ. P. 12 .............................................................................................. 9

Fed. R. Civ. P. 56 ............................................................................................ 10

**State Cases**

*Alma W. v. Oakland Unified Sch. Dist.*,
    123 Cal. App. 3d 133 (1981) ...................................................................... 12

*Debbie Reynolds Pro. Rehearsal Studios v. Superior Court*,
    25 Cal. App. 4th 222 (1994) ....................................................................... 12

*Farmers Ins. Grp. v. County of Santa Clara*,
    11 Cal. 4th 992 (1995) ............................................................................... 12

*Jeffrey E. v. Cent. Baptist Church*,
    197 Cal. App. 3d 718 (1988) ...................................................................... 12

*John R. v. Oakland Unified Sch. Dist.*,
    48 Cal. 3d 438 (1989) ................................................................................ 12

*John Y. v. Chaparral Treatment Ctr., Inc.*,
    101 Cal. App. 4th 565 (2002) ..................................................................... 12

*Juarez v. Boy Scouts of Am., Inc.*,
    81 Cal. App. 4th 377 (2000) ....................................................................... 12

*Lisa M. v. Henry Mayo Newhall Memorial Hosp.*,
    12 Cal. 4th 291 (1995) ........................................................................... 12, 13

*M.P. v. City of Sacramento*,
    177 Cal. App. 4th 121 (2009) ................................................................. 12, 13

*Maria D. v. Westec Residential Sec., Inc.*,
    85 Cal. App. 4th 125 (2000) ....................................................................... 12

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    Introduction

Plaintiff Peter L. Fear, in his capacity as the trustee of the bankruptcy estate of Orlonzo Hedrington, seeks money damages from the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–80, based on Hedrington's claim that he was sexually assaulted while recovering from heart surgery at David Grant Medical Center ("DGMC") on Travis Air Force Base. Specifically, Hedrington alleges he was the victim of a vast conspiracy of physicians, nurses, and other federal employees who were emboldened by former President Donald Trump to sodomize Black men.

This action must be dismissed because Hedrington's allegations are too vague, bizarre, and delusional to invoke federal subject-matter jurisdiction. The FTCA also does not provide subject-matter jurisdiction because the purported conduct of federal employees falls well outside the scope of their employment, and these allegations are further barred by the intentional-tort and discretionary-function exceptions to the FTCA's waiver of sovereign immunity. *See id.* §§ 1346(b)(1), 2680(a), (h). And even if the Court had subject-matter jurisdiction, summary judgment must be granted in favor of the United States because this lawsuit is barred by the doctrine of res judicata, and there is insufficient evidence to support any claim of "medical negligence" against the United States.

## II.    Background

### A.    Hedrington's Surgery and Tort Claim against the United States

Hedrington was a patient at DGMC in January 2016. Declaration of Joseph Frueh ("Frueh Decl.") Ex. E (Hedrington Dep.), at 23:11–23:15. On January 18, he underwent an emergent coronary artery bypass graft procedure, and then recovered at DGMC until January 22. *Id.* at 22:19–22:24, 23:11–23:15. He then transferred to the Fresno VA, where he stayed until February 12, 2016. *Id.* at 23:24–24:5, 26:20–26:22.

Later that summer, Hedrington met and prayed with a young man at his church who was sexually assaulted. *Id.* at 28:12–29:7. That experience "triggered something" in Hedrington, and he began reporting his own sexual assault that allegedly occurred at DGMC. *Id.* at 28:12–29:7. Pursuant to the FTCA, Hedrington filed an administrative tort claim with the federal government on August 28, 2017, in

which he sought $5 million in damages.  *See* Compl. (ECF 1) ¶ 6 & Ex. A.  The Air Force denied the

administrative tort claim on February 27, 2018.  *See* Compl. (ECF 1) ¶ 6.

### B.     The Investigation of Hedrington's Alleged Sexual Assault

Agents from the United States Air Force Office of Special Investigations ("OSI") investigated

Hedrington's alleged sexual assault in cooperation with the Fairfield Police Department.  *See* Frueh

Decl. Ex. E (Hedrington Dep.), at 95:11–96:3.  This investigation included two interviews with

Hedrington.  Frueh Decl. Ex. C (3/3/2017 Interview); *id.* Ex. D (6/26/2017 Interview).

During the interviews, Hedrington recalled recovering in DGMC's intensive care unit ("ICU")

after surgery.  Frueh Decl. Ex. C (3/3/2017 Interview), at 4:1–4:19.  A physical therapist regularly

visited him and assisted with walking around the ICU.  *Id.* at 4:21–5:17.  Hedrington described the

physical therapist as a "clean cut," "jolly," and "playful" white man in his mid-30s with white medical

scrubs.  *Id.* at 21:4–21:9, 19:10–19:18, 20:14–20:22 & Frueh Decl. Ex. D (6/26/2017 Interview), at 5:1–

5:23.  At one point, Hedrington asked a woman for the physical therapist's name, and she said it was

"Jerry or something."  Frueh Decl. Ex. C (3/3/2017 Interview), at 43:18–44:5.

Hedrington reported feeling uncomfortable around the physical therapist.  *See id.* at 6:14–6:20.

Hedrington felt the man was "pushing up a little bit too close" and "there was another agenda," so

Hedrington "told him to stay away" and "get back."  *Id.* at 19:20–20:10; *see also id.* at 24:1–24:12 ("He

was, like, putting his hand in the middle of my back.").

After a few days, Hedrington asked the physical therapist to take him to the room where he

stayed before surgery.  *Id.* at 6:22–7:14, 28:18–28:23.  Using a wheelchair, the physical therapist took

Hedrington to "a place where there was a table but no windows, a place where there [were] a few

chairs."  *Id.* at 7:2–7:10.  The OSI agents asked Hedrington whether this place was "on a separate floor"

from the ICU—*i.e.*, "did [Hedrington] go down an elevator . . . or was it in the hospital on the same

floor," to which Hedrington responded, "Hm.  Wow, I didn't think about that."  *Id.* at 28:18–29:3.

Hedrington listened to the physical therapist "and another guy talking" for "about [an] hour to

two hours."  *Id.* at 7:2–7:10.  Hedrington then added, "I think it was two to three guys in the room," and

they "were laughing, you know, kind of joking around, and I'm sitting in there waiting."  *Id.* at 35:3–

35:18.  Hedrington eventually told the physical therapist he "want[ed] another shot or something"

because he "was feeling pain in his chest." *Id.* at 8:10–8:15.  The physical therapist administered an

injection, and Hedrington lost consciousness.  *See id.* at 8:20–9:4.

Hedrington awoke in "the same spot" with the physical therapist.  *Id.* at 39:3–39:10.  Hedrington

"felt like [his] clothes [were] moved or something.  [He] just felt different."  *Id.* at 39:12–39:16.  He also

felt "pressure in [his] backside" as though he "had a bowel movement or something."  *Id.* at 9:6–9:14.

Hedrington asked the physical therapist to wheel him to a restroom.  *See id.* at 9:6–9:14, 40:11–40:25.

Inside the restroom, Hedrington disrobed and wiped himself with toilet paper and observed a

"clear" and "watery" substance like "silicon[e]."  *See id.* at 37:20–38:4.  Hedrington first thought it "was

some type of discharge coming from the medication or something."  *Id.* at 9:16–9:23.  But then he

smelled the substance and concluded it was semen, and he surmised that the physical therapist had

sodomized him.  *See id.* at 9:25–11:25 & 38:7–38:14.

Hedrington flushed the toilet paper and did not mention the incident to anyone.  *See id.* at 10:23–

11:4; *see also id.* Frueh Decl. Ex. E (Hedrington Dep.), at 28:5–28:11.  That evening, and for several

days thereafter, Hedrington recalled "hallucinating . . . for a long period of time," during which he

reported seeing his deceased mother and other "dead people."  Frueh Decl. Ex. C (3/3/2017 Interview),

at 29:10–30:16; *see also* Frueh Decl. Ex. E (Hedrington Dep.), at 21:2–22:18.

After interviewing Hedrington, the OSI agents showed him photographs of people from his care

team at DGMC, along with a few stock photographs.  *See* Frueh Decl. Ex. E (Hedrington Dep.),

at 94:18–95:10, 95:22–96:24 & Ex. E-4 (Photograph Array), Ex. E-6 (Fairfield Police Department

Record).  Per Hedrington's medical records, his physical therapist was Senior Airman David Alex

Hunter, but Hunter was excluded from the array because he was Black and did not fit the description

Hedrington provided.  *See* Frueh Decl. Ex. E (Hedrington Dep.), at 96:22–96:24, 106:18–106:25,

107:13–109:3, 123:2–123:19, 124:16–126:9 & Ex. E-6 (Fairfield Police Department Record).

Hedrington chose one of the stock photographs and stated he was 70-percent sure it depicted the person

who assaulted him.  Frueh Decl. Ex. E (Hedrington Dep.), at 97:11–97:23, 104:3–104:20 & Ex. E-4

(Photograph Array), at USA_003319.  The investigation was ultimately suspended due to lack of

evidence.  *See* Frueh Decl. Ex. E (Hedrington Dep.), at 99:10–99:25 & Ex. E-5 (Fairfield Police

Department Record); *see also* Compl. (ECF 1) ¶ 6.

About two and a half years later, Hedrington called the Fairfield Police Department and advised he now was 90-percent sure the photograph he had selected depicted the person who assaulted him. Frueh Decl. Ex. E (Hedrington Dep.), at 101:18–104:20 & Ex. E-5 (Fairfield Police Department Record).  Hedrington later testified that this new estimate was a lie intended to revive the investigation. Frueh Decl. Ex. E (Hedrington Dep.), at 104:5–104:20.

### C.  Hedrington's Litigation Against the United States

#### 1.  *Fear v. United States*, E.D. Cal. No. 2:18-cv-02333-KJM-DB

Hedrington filed this lawsuit against the United States on August 24, 2018.  ECF 1.  He asserted one claim for "Medical Negligence . . . under the Federal Tort Claims Act."  Compl. (ECF 1) ¶¶ 8–10. He specifically alleged that federal employees "so negligently supervised and transported [him] to and from physical therapy and recovery that [he] was allowed to be drugged and sexually touched and penetrated without his consent."  *See id.* ¶ 9.

The United States moved for summary judgment, asserting Hedrington lacked standing because he failed to disclose his claim against the United States during his bankruptcy.  *See* ECF 23-1, at 5–6; *see also, e.g.*, *Cusano v. Klein*, 264 F.3d 936, 945–46 (9th Cir. 2001) ("If [the debtor] failed properly to schedule an asset, including a cause of action, that asset continues to belong to the bankruptcy estate and did not revert to [the debtor].");  *see also Moralez v. Vilsack*, No. 16-282, 2017 WL 4652730, at *5 (E.D. Cal. Oct. 17, 2017) ("Because Plaintiff did not list the claims in her asset schedules, the trustee neither administered them nor abandoned them at the close of the bankruptcy case, and they remained the property of the bankruptcy estate."), *aff'd*, 770 F. App'x 348, 349 (9th Cir. 2019).  After the United States filed its motion, Hedrington executed a settlement agreement with the bankruptcy trustee to resolve the nondisclosure issue.  *See* ECF 30 (Ex. A) § I ¶¶ 1–9.

Per the settlement agreement, the trustee hired Hedrington's attorney to prosecute the claim against the United States on behalf of the bankruptcy estate.  *Id.* § II ¶ 1.  Hedrington and the trustee agreed to split the net proceeds of any recovery.  *Id.* § I ¶ 8.  The trustee substituted in place of Hedrington as the plaintiff in this action on June 30, 2021.  ECF 44.  The United States' motion for summary judgment was denied as moot.  ECF 48.

### 2.   *Hedrington v. United States, et al.*, E.D. Cal. No. 2:21-cv-00414-KJM-DB

After executing the settlement agreement, Hedrington filed a new lawsuit *pro se* in Solano County Superior Court against DGMC, several federal employees, and the County of Solano and the Fairfield Police Department arising from the same allegations underlying the instant action.  *See* Frueh Decl. ¶¶ 2–3 & Ex. A (State Court FAC).  Counsel for the United States notified Hedrington's attorney (now counsel for the trustee) about the new state-court lawsuit, provided a copy of the complaint, and asked whether and how counsel planned to address the situation.  *Id.* ¶¶ 3–4 & ECF 38-2, at 2–4.

Receiving no substantive response, counsel for the United States advised that he planned "to take steps to protect the interests of the federal employees [Hedrington] sued in state court, to include removing the case to federal court and moving to dismiss and/or summary judgment."  *Id.* ¶ 5 & ECF 38-2, at 2.  Again receiving no response, the United States removed the case to federal court and substituted in place of the federal employees pursuant to 28 U.S.C. § 2679(d)(2).  *See id.* ¶ 6.

The United States then moved for summary judgment, contending that Hedrington's new lawsuit was barred by the applicable statute of limitations because it was not filed within six months of the Air Force's denial of his administrative tort claim.  *See id.* ¶ 8.  The Court granted the motion, and Hedrington did not appeal.  *Id.*  Hedrington moved for reconsideration, which was denied.  *Id.*[1]

### 3.   **Hedrington's Testimony in *Fear v. United States***

The United States proceeded to take Hedrington's deposition, during which he provided new information about his alleged assault.  Among other things, Hedrington testified that his assault was part of a preplanned and coordinated conspiracy among his attending cardiologist (Dr. Joseph Sky), his cardiothoracic surgeon (Dr. Broadus Atkins), a white physical therapist named "Alex David" (not to be confused with his Black physical therapist, David Alex Hunter), as well as DGMC's nurse practitioners and registered nurses and the Air Force's OSI agents, with the goal of sodomizing Black men and covering up the evidence.  *See* Frueh Decl. Ex. E (Hedrington Dep.), at 36:5–38:14, 113:10–115:8, 115:21–117:2, 123:2–126:9; *see also* Frueh Decl. Ex. E-7 (Civil Rights Complaint, pp. 1–6 of Ex. A).

---

[1] Hedrington has filed another lawsuit in this Court captioned *Hedrington v. David Grant Medical Center, et al.*, E.D. Cal. No. 2:22-cv-00074-KJM-DB, which remains pending to date.

Specifically, Hedrington believes Dr. Sky scheduled him for emergency surgery at DGMC instead of the Palo Alto VA as a premeditated step toward furthering this conspiracy. *See* Frueh Decl. Ex. E (Hedrington Dep.), at 36:5–38:14; *see also* Frueh Decl. Ex. E-7 (Civil Rights Complaint, p. 1 of Ex. A). As for Hedrington's surgeon, Dr. Atkins, Hedrington contends he failed to remove "PEG tubes" from his body after surgery as a pretext for seeing him again and participating in the alleged assault.[2] *See id.* Frueh Decl. Ex. E (Hedrington Dep.), at 39:21–40:11, 58:19–59:15, 65:8–65:15. And as for "Alex David," Hedrington claims he identified this perpetrator from an unspecified portion of his medical records. *See id.* at 107:1–107:17. Hedrington also attests that, when he filed a complaint with the State Medical Board about his care at DGMC, he learned the Board was investigating a physician named "Alex David," so he surmised that this person was the white physical therapist who allegedly sodomized him. *See id.* at 109:18–111:15.

Hedrington believes the conspiracy to sodomize him was motivated by his race. *See id.* at 118:12–118:20 (Q: "You believe that this conspiracy to assault you was based in part on your race; is that right?" A: "Yes, yes, yes. You know, we live in America and there is double standards, be honest with it. . . . These are all white men. . . . So when you have people like this, all white men attacking a black man, you got to—the white on black crime; okay?"); *id.* at 41:1–41:10 (noting his alleged assault "was during the time that Donald Trump got in office and most white men were empowered").

He also believes the conspiracy was motivated by disdain for his Christian beliefs. *See id.* at 39:21–40:11, 118:25–119:5. Hedrington recalls asking Dr. Atkins to pray with him before surgery, and he "think[s] Dr. Atkins got offended by that . . . . I felt the vibe, and even some of my people felt the vibe. . . . But I believe, you know, with those tubes—he staged those tubes in me, staged them, you know . . . . They stayed there all the way until my discharge time. That was his way of getting back to me." *Id.* at 39:21–40:11; *see* Frueh Decl. Ex. E-7 (Civil Rights Complaint, p. 1 of Ex. A, which states: "Dr. Atkins felt bothered with the honor/respect. Really mortify him seeing display of love/care. He

---

[2] Hedrington arrived at his "PEG tube" theory using a portion of his medical records containing the initials of a medical technician named Payton E. Glassic. *See* Frueh Decl. Ex. E (Hedrington Dep.), at 61:2–64:20 & Ex. E-3 (DGMC Medical Record Re: Scheduled Medications).

was insulted, embarrassed, humiliated, then revengeful sought for payback by drug[ging], assaulting me by keeping PEG tubes in me . . . .").

As for the assault itself, Hedrington revised his memory of a physical therapist who wore white medical scrubs. *See supra* p. 2:10–2:12.  Hedrington now recalled that the physical therapist "Alex David" wore a military uniform with "bars on it . . . on the side or around the collar or something." Frueh Decl. Ex. E (Hedrington Dep.), at 52:2–53:5.  "Alex David" took Hedrington from the ICU to an elevator, which descended to a laboratory and classroom in the basement or ground floor of DGMC. *See id.* at 66:24–69:17.  There, Hedrington recalled seeing Dr. Sky and two other persons.  *Id.* at 67:17– 68:14.  He also saw trees outside the windows, and agreed that "it was bright outside, it was a sunny day."  *Id.* at 71:5–72:10.  After overhearing "Alex David" speak to the group for about 20 minutes, Hedrington complained that he was in pain. *Id.* at 74:6–74:23.  "Alex David" then left the room, and Dr. Atkins appeared with a syringe and injected Hedrington with something that caused him to lose consciousness.  *Id.* at 74:24–76:3.

Hedrington later awoke in a wheelchair in the same area with "Alex David."  *See id.* at 76:4– 76:10.  Hedrington reported feeling something unusual about his clothing, as though "somebody else put them on."  *Id.* at 76:14–76:22.  He also recalled feeling "like [he] had defecated on [himself]."  *Id.* at 76:23–77:7.  "Alex David" then wheeled Hedrington to a restroom, where Hedrington wiped himself with toilet paper and observed a "white substance" that he at times described as "caulking" or "Vaseline."  *Id.* at 78:20–79:6, 80:14–80:19, 81:2–81:9.  He did not recognize it visually right away as semen, *see id.* at 81:18–81:20, but when he smelled the substance, he concluded it was semen.  *Id.* at 81:18–81:23.  Hedrington could not describe the scent or identify anything analogous, other than to say, "you know, you go into a room and you know [there's] been sex there, some sex is going on."  *Id.* at 81:24–82:17.

### 4.    Hedrington's Mental Evaluation in *Fear v. United States*

Pursuant to Federal Rule of Civil Procedure 35, Hedrington submitted to a mental evaluation with Dr. Jessica Ferranti, M.D., at the Department of Psychiatry and Behavioral Sciences at U.C. Davis Medical Center.  *See* Declaration of Jessica Ferranti, M.D. ("Ferranti Decl.") Ex. B (Report), at 1.  Dr. Ferranti's evaluation lasted five and a half hours, which included a psychiatric interview, mental-status

7

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

examination, and psychological testing.  *See id.* at 1, 10–13.  She also reviewed Hedrington's medical records and the interviews he gave to Air Force OSI agents in 2017.  *See id.* at 1–2.

Dr. Ferranti found that Hedrington met the criteria for a delusional disorder with a persecutory subtype.  *Id.* at 45.  She noted Hedrington's "thought content exhibited persecutory and paranoid themes," most prominently the belief that "he is the victim of a system-wide 'conspiracy' to 'cover up' sexual assaults that are occurring at DGMC" involving "all the doctors (including his cardiac surgeon and the presiding cardiologist), nurses, ICU personnel (including clerks and administrative personnel), and ancillary hospital staff," as well as "the Fairfield Police Department, the Department of Justice, and other institutions."  *Id.* at 46.  He also exhibited a "thought process disorder in which he elaborates and/or expands his delusional construct in response to reality-based hypothetical challenges," most evidently in the way his "delusion regarding a massive conspiracy" has become "more expansive" and "more convoluted over time since his original allegations."  *Id.*

Hedrington also exhibited other clinical features of a thought disorder, such as "an extreme unquestioning nature to his discourse, asserting one hundred percent conviction in his allegations and an irrational (disconnected to reality factors such as evidence to the contrary) certainty to his recollections," to include deeming "a look on someone's face" or "aspects of his care such as transport delays" to be "per se evidence of malfeasance," and asserting "that his memory was '100 percent' for the alleged events he claims, while at the same time incongruently acknowledging he had serious concerns about his memory deficits and cognitive functioning since at least 2017."  *Id.* at 47.

"Due to his thought disorder," Dr. Ferranti continues, Hedrington "is unable to consider that he may have been confused or have distorted memories . . . due to the invasive medical procedure he underwent and periods of altered mental status (delirium)."  *Id.*  Specifically, Hedrington refuses "to consider the possibility (based on copious evidence in his medical chart and in his own personal experience) that he was suffering from an altered mental status (delirium) in the [ICU], despite his own recollection of seeing 'dead people' and feeling 'delusional' and 'paranoid' in his recovery period after his surgery."  *Id.*

Based on her medical training and experience, Dr. Ferranti further determined that Hedrington's medical records "strongly support that it is most likely that [he] experienced a period of delirium while

Mem. of Points & Authorities in Supp. of
Def. USA's Mot. for Dismissal or Summ. J.

8

he was hospitalized in the ICU." *Id.* at 51–52 (noting further that "[v]isual hallucinations are common in delirium," and "[m]emories of delirium can be frightening and vivid"). "Compared with other surgical types, coronary artery bypass graft (CABG) and vascular surgery are associated with twice as high rates of postoperative delirium." *Id.* at 55. Notably, nursing notes on January 21 and 22, 2016, show Hedrington was experiencing signs of delirium; physicians who treated him in the ICU opined that he likely experienced delirium; and Hedrington testified about having symptoms of delirium, including hallucinations, feeling "delusional," and paranoia. *See id.* at 52–53. Hedrington also had "numerous risk factors for delirium," including his receipt of "narcotic and sedative medications that commonly cause delirium," "post-operative anemia," sleep deprivation throughout his ICU stay, and obstructive sleep apnea with diminished oxygen saturation. *See id.* at 54.

Dr. Ferranti further opined that "it is most likely that the necessary focus on bowel recovery that is standard after any major surgery formed a delusional nidus upon which Mr. Hedrington developed the notion that he was anally penetrated sexually." *Id.* at 55. Hedrington generally recalled he was "constipated the whole time that [he] was at [DGMC]," and his providers "kept telling [him] to drink" a laxative. *See* Frueh Decl. Ex. E (Hedrington Dep.), at 90:25–91:13. His medical records further document that there were standing orders for rectal suppositories. *See* Ferranti Decl. Ex. B (Report), at 27, 55; *see also id.* at 55 ("In response to the nursing prompt 'initiate laxatives and stool softeners,' nurse Rebecca Parker indicates that the goal has been 'met.'"). And his medical records also document that he received at least one standard rectal examination during his recovery. *See id.* at 26, 55.

## III.   Legal Standards

### A.   Rule 12(b)(1)

A motion under Rule 12(b)(1) challenges a federal court's jurisdiction to decide claims alleged in the complaint. Fed. R. Civ. P. 12(b)(1); *see also id.* 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). The motion may be a "facial attack" based solely on the complaint, or a "factual attack" that looks beyond the pleadings to challenge "the substance of a complaint's jurisdictional allegations despite their formal sufficiency." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA's MOT. FOR DISMISSAL OR SUMM. J.

9

When considering a factual attack on subject-matter jurisdiction, "[n]o presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). "[T]he district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

### B.    Rule 56

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is to "pierce the pleadings and to assess the proof . . . to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000) ("[A] moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing'—that is, pointing out through argument—the absence of evidence to support plaintiff's claim"). To survive summary judgment, a plaintiff must then submit evidence "sufficient to support a verdict . . . on every element of [a] claim for which [he or she] will carry the burden of proof." *In Re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

"This burden is not a light one." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Opposing summary judgment requires "significant probative evidence." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). Conjecture, speculation, or evidence that is "merely colorable" is insufficient. *Id.*; *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). "Summary judgment must be granted where there is not 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *River City Markets, Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992).

10

Mem. of Points & Authorities in Supp. of
Def. USA's Mot. for Dismissal or Summ. J.

**IV.   Argument**

    **A.   This action must be dismissed for lack of subject-matter jurisdiction.**

        **1.   The allegations giving rise to this case are too vague and delusional to invoke federal subject-matter jurisdiction.**

Dismissal for lack of subject matter jurisdiction is proper where a claim is "so insubstantial, implausible, foreclosed by prior decisions . . . , or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).  For example, in *Norton v. FBI*, No. 08-1829, 2010 WL 431367 (C.D. Cal. Jan. 28, 2010), the plaintiff presented "a series of bizarre and vague allegations" related to a separate lawsuit through which the plaintiff sought to "expose" the FBI and the Riverside Police Department for their "conspiratorial acts of fraud and for their abuses upon innocent people." *Id.* at *2.  The plaintiff specifically claimed that the FBI and the Riverside Police Department stole "over 20,000 pages of 'federal documents'" from the plaintiff in order to conceal the alleged conspiracy.  *See id.*  After thoroughly surveying the extant case law concerning such claims, the district court held that the plaintiff's allegations were so "delusional and implausible that federal subject matter jurisdiction cannot exist."  *Id.* at *6.

Similarly, in *O'Brien v. U.S. Department of Justice*, 927 F. Supp. 382 (D. Ariz. 1995), the plaintiff sued the U.S. Department of Justice and various federal officials and other defendants who allegedly engaged in a "conspiracy" to subject the plaintiff "to countless dating/raping game participants in an effort to orchestrate her personal life and dictate to her, whom she should marry." *Id.* at 385.  The district court dismissed the lawsuit, holding the plaintiff's allegations were "so bizarre and delusional" that they could not invoke federal jurisdiction.  *Id.*  The Ninth Circuit affirmed.[3]

Here, the few staid allegations in the operative Complaint do not present a claim that is so implausible as to fail for want of jurisdiction on its face.  *See* Compl. (ECF 1) pp. 1–2 & ¶¶ 8–10.  But now—after discovery and Hedrington's full presentation of his allegations—it is clear this case is indeed "devoid of merit."  *Steel Co.*, 523 U.S. at 89; *see, e.g.*, *Wilson v. N.Y. City Police Dep't*, No. 09-2632, 2013 WL 878585, at *20 (S.D.N.Y. Feb. 6, 2013) (dismissing, on summary judgment, the plaintiff's

---

    [3] *See* 76 F.3d 387 (9th Cir. 1996) ("We affirm the district court's dismissal for lack of subject matter jurisdiction of Leda O'Brien's action for the reasons set forth in the district court's order . . . .").

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

11

claims of hostile work environment and constructive discharge because they were "accurately characterized as legally insufficient or delusional"), *adopted*, 2013 WL 929654 (S.D.N.Y. Mar. 11, 2013); *Brown v. Rodarmel*, No. 10-293, 2013 WL 1249023, at *4 (M.D. Pa. Mar. 27, 2013) (same, for the plaintiff's theory that "a multitude of federal correctional officials including the Director of the BOP and the Warden of USP-Lewisburg, as well as multiple additional USP-Lewisburg and BOP staff engaged in a wide ranging conspiracy for the ultimate purpose of having him killed").

In sum, as in *Norton*, *O'Brien*, *Wilson*, and *Brown*, Hedrington's contention that he is the victim of a hospital-wide conspiracy to sodomize Black men and conceal the evidence is so vague, bizarre, and delusional that it cannot invoke federal subject-matter jurisdiction.  *See generally* Frueh Decl. Ex. E (Hedrington Dep.), at 28–29, 36–41, 57–60, 64–82, 98–101, 107–19, 121–26; Frueh Decl. Ex. E-7 (Civil Rights Complaint, pp. 1–6 of Ex. A).  This action accordingly must be dismissed.

## 2. The alleged wrongful conduct falls outside the scope of federal employment.

The FTCA waives the sovereign immunity of the United States "for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).  Whether a federal employee acted within the scope of his or her employment turns on "the principles of respondeat superior of the state in which the alleged tort occurred."  *Pelletier v. Fed. Home Loan Bank*, 968 F.2d 865, 876 (9th Cir. 1992).

In California, liability under respondeat superior is imposed if the employee's conduct "may fairly be regarded as typical of or broadly incidental to the enterprise undertaken by the employer." *Farmers Ins. Grp. v. County of Santa Clara*, 11 Cal. 4th 992, 1003 (1995); *see id*. at 1003 (test for respondeat superior is whether, "in the context of the particular enterprise[,] an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business").  Under this framework, California courts consistently hold that employers are not liable for the sexual misconduct of employees.  *See id.* at 1006 (collecting cases).[4]

---

[4] *See, e.g.*, *Lisa M. v. Henry Mayo Newhall Memorial Hosp.*, 12 Cal. 4th 291, 299–306 (1995) (hospital not liable for ultrasound technician's sexual molestation of a patient); *John R. v. Oakland Unified Sch. Dist.*, 48 Cal. 3d 438, 447–50 (1989) (school district not vicariously liable for teacher's sexual molestation of student); *John Y. v. Chaparral Treatment Ctr., Inc.*, 101 Cal. App. 4th 565, 574 (2002) (trial court did not error in refusing to give jury instruction for vicarious liability of residential treatment center whose counselor molested resident); *Maria D. v. Westec Residential Sec., Inc.*, 85 Cal.

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

12

This is because an employer cannot be vicariously liable where an employee substantially deviates from employment duties for personal purposes.  *Id.* at 1004–05; *see id.* at 1007 (acts of sexual misconduct were undertaken "solely for employees' personal gratification and had no purpose connected to the employment").  Further, "[i]f an employee's tort is personal in nature, mere presence at the place of employment and attendance at occupational duties prior or subsequent to the offense will not give rise to a cause of action against the employer under the doctrine of respondeat superior."  *Id.* at 1005.

For example, in *Lisa M.*, the California Supreme Court considered whether an ultrasound technician was acting within his scope of employment when he sexually molested a patient "under the pretense of conducting an ultrasound imaging examination," for which the technician was criminally prosecuted and pleaded no contest to a felony charge.  *See* 12 Cal. 4th at 294, 296.  After surveying prevailing case law on respondeat superior, the court held the hospital was not liable for the ultrasound technician's conduct because the "motivating emotions" of the "sexual tort" were not "fairly attributable to work-related events or conditions"—rather, "the opposite was true: [the] technician simply took advantage of solitude with a naïve patient to commit an assault for reasons unrelated to his work."  *See id.* at 301.  The "connection between [the ultrasound technician's] employment duties—to conduct a diagnostic examination—and his independent commission of a deliberate sexual assault was too attenuated," and his "sexual assault on a patient is not a risk predictably created or fairly attributed to the nature of the technician's employment."  *Id.* at 305.

---

App. 4th 125, 145–50 (2000) (security company not liable for rape committed by on-duty security guard); *Juarez v. Boy Scouts of Am., Inc.*, 81 Cal. App. 4th 377, 393–94 (2000) (Boy Scouts not liable to boy who was sexually molested by volunteer scout leader); *Debbie Reynolds Pro. Rehearsal Studios v. Superior Court*, 25 Cal. App. 4th 222, 226–29 (1994) (dance studio not liable for sexual molestation of student by dance instructor); *Jeffrey E. v. Cent. Baptist Church*, 197 Cal. App. 3d 718, 721–24 (1988) (church not liable for sexual assault by Sunday school teacher); *Alma W. v. Oakland Unified Sch. Dist.*, 123 Cal. App. 3d 133, 139 (1981) (school district not liable for rape of student by janitor).

As noted in *Taylor v. United States*, California courts have held employers vicariously liable for sexual torts only in "rare circumstances" involving a "unique dynamic, such as the authority of police officers over detainees or the special relationship between therapists and their clients."  No. 13-371, 2013 WL 3223420, at *4 (C.D. Cal. June 25, 2013) (citing *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202 (1991); *Richard H. v. Larry D.*, 198 Cal. App. 3d 591 (1988)); *see also M.P. v. City of Sacramento*, 177 Cal. App. 4th 121, 124 (2009) (limiting *Mary M.* to its facts and holding that the city was not liable for sexual assault by firefighters).

Similarly, in *Taylor v. United States*, the court considered whether a mail carrier was acting within his scope of employment with the United States Postal Service ("USPS") when, while delivering mail to a member of the public, he exposed himself and masturbated. *See* No. 13-371, 2013 WL 3223420, at *1 (C.D. Cal. June 25, 2013). After considering *Lisa M.* and other California cases analyzing employer liability for sexual misconduct, the court held that the mail carrier's actions were "neither 'typical of [nor] broadly incidental to' his duties as a letter carrier for the USPS, and by any measure [were] a 'substantial deviation' from his standard duties." *Id.* at *3–4 (citation omitted).

Here, even accepting Hedrington's vague and implausible allegations to be true, such conduct by the federal employees who allegedly conspired to sodomize him would clearly be personally motivated and bear no relationship to their employment duties—and Hedrington concedes as much. *See* Frueh Decl. Ex. E-7 (Civil Rights Complaint, p. 1 of Ex. A, which alleges that the averred conspirators were "working beyond the scope of their work, using [government] material for their own sexual pleasure and gratification"). That the employees' purported acts occurred while working at DGMC is insufficient for vicarious liability. *See Taylor*, 2013 WL 3223420, at *2 ("That the employment brought tortfeasor and victim together in time and place is not enough." (quoting *Lisa M.*, 12 Cal. 4th at 298)). Accordingly, because the alleged wrongful conduct in this case falls outside the scope of any averred tortfeasor's federal employment, this case must be dismissed for lack of subject-matter jurisdiction.

### 3. The allegations giving rise to this case fall within the intentional-tort exception to the FTCA's waiver of sovereign immunity.

Under the FTCA, Congress has not waived the sovereign immunity of the United States for "[a]ny claim arising out of" certain enumerated torts, including assault and battery. *See* 28 U.S.C. § 2680(h). This intentional-tort exception bars not only the torts enumerated in § 2680(h), but also claims based on the same underlying conduct. *See, e.g.*, *Sheehan v. United States*, 896 F.2d 1168, 1171 (9th Cir. 1993) ("Thus the issue in this case is whether the conduct upon which plaintiff rests her claim for intentional infliction of emotional distress constitutes an assault as that tort is traditionally defined. If it does, then the claim is barred by § 2680(h) because Congress excluded governmental liability for assaults committed by government employees."). Accordingly, the plain text of § 2680(h) divests this Court of jurisdiction over this case, which arises from a sexual assault and sexual battery. *See Hallett v.*

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

14

*U.S. Dep't of Navy*, 850 F. Supp. 874, 878 (D. Nev. 1994) (dismissing claims for "sexual assaults and batteries allegedly perpetrated by Naval officers").

**4.      Any claim of negligent supervision is barred by the discretionary-function exception to the FTCA's waiver of sovereign immunity.**

Under the discretionary-function exception, the FTCA's waiver of sovereign immunity cannot apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary-function exception prevents "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy," and the exception applies not only to decisions at the "policy or planning level," but also to "[d]ay to day management" decisions involving choice or judgment. *United States v. Gaubert*, 499 U.S. 315, 323, 325 (1991).

Applying the discretionary-function exception involves two steps. First, a court must determine whether the "challenged conduct involves an element of judgment or choice." *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000). Where there is no "federal statute, regulation, or policy [that] specifically prescribes a course of action," then this requirement is satisfied. *Gaubert*, 499 U.S. at 322. Second, the court must determine whether the challenged conduct, "by its nature, [is] susceptible to a policy analysis." *Nurse*, 226 F.3d at 1001. This requirement focuses "not on the agent's subjective intent" or whether his conduct "was *actually* [] grounded in policy considerations," but rather on "the nature of the actions taken and on whether they are *susceptible* to policy analysis." *Gaubert*, 499 U.S. at 325 (emphasis added); *Nurse*, 226 F.3d at 1001.

**a.      Plaintiff fails to identify any specific and mandatory requirement that DGMC violated in supervising its employees.**

Although the United States bears the ultimate burden of proving that the discretionary-function exception applies, a plaintiff must nonetheless allege a claim "that is facially outside the discretionary function exception in order to survive a motion to dismiss." *Doe v. Holy See*, 557 F.3d 1066, 1084 (9th Cir. 2009) (per curiam) (quoting *Prescott v. United States*, 973 F.2d 696, 702 & n.4 (9th Cir. 1992)); *see Ard v. F.D.I.C.*, 770 F. Supp. 2d 1029, 1036 (C.D. Cal. 2011) (requiring the plaintiffs to identify

whether any federal statute, regulation, or policy applied to the conduct challenged in their lawsuit).

Here, Plaintiff fails to identify any statute, regulation, or other specific and mandatory requirement that

DGMC failed to follow in supervising any of the federal employees who allegedly conspired to sexually

assault him.  The first step of the discretionary-function exception is thus satisfied.

> ### b. Decisions regarding the supervision of federal employees are susceptible to policy analysis.

The supervision of federal employees not only involves "an element of judgment or choice," but

also involves personnel decisions that Congress intended to shield from judicial review.  Indeed, the

Ninth Circuit has long held that claims of "negligent and reckless employment, supervision and training

. . . fall squarely within the discretionary function exception."  *Nurse*, 226 F.3d at 1001; *see Vickers v.*

*United States*, 228 F.3d 944, 950 (9th Cir. 2000) (holding that the discretionary-function exception

barred claims of negligent supervision where a federal employee who shot the plaintiff with a service

revolver did not attend firearms testing and was pending termination); *see also West v. United States*,

No. 15-1243, 2016 WL 1576382, at *4 (C.D. Cal. Apr. 11, 2016) (holding that the discretionary-

function exception barred claims of negligent supervision where a postal worker sexually abused a

woman and her children on his delivery route, and relying principally on the Ninth Circuit's analogous

decision in *Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009) (per curiam)).  Accordingly, insofar as

Plaintiff contends that DGMC negligently supervised the employees who purportedly conspired to

sexually assault Hedrington, such a theory is barred by the FTCA's discretionary-function exception.

> ### B. Even if this Court had jurisdiction, summary judgment must be granted in favor of the United States because this action is barred by res judicata.

"Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any

claims that were raised or could have been raised in the prior action."  *Owens v. Kaiser Found. Health*

*Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (quoting *W. Radio Servs. Co. v. Glickman*, 123 F.3d 1189,

1192 (9th Cir. 1997)).  "The doctrine is applicable whenever there is '(1) an identity of claims, (2) a

final judgment on the merits, and (3) identity or privity between parties.'"  *Id.* (quoting *W. Radio Servs.*,

123 F.3d at 1192).  Here, this Court's final judgment in *Hedrington v. United States, et al.*, E.D. Cal.

No. 2:21-cv-00414-KJM-DB ("Case 21-414"), satisfies each of these elements.

16

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

*First*, Case 21-414 and the instant action share "an identity of claims" because they "arise out of the same transactional nucleus of facts." *Owens*, 244 F.3d at 714 (quoting *Frank v. United Airlines, Inc.*, 216 F.3d 845, 851 (9th Cir. 2000)). Hedrington's complaint in Case 21-414 and the Court's decision granting summary judgment recount the same facts underlying the instant action, and the Court expressly noted that the two cases "involve the same allegations" and arise from the same administrative tort claim. *See* Frueh Decl. Ex. A (State Court FAC) ¶ 4; *id.* Ex. B (Findings and Recommendations), at 2 & 8 n.2. Although the instant action was filed before Case 21-414, "[t]he date of judgment, not the date of filing, controls the application of res judicata principles." *Hawkins v. Risley*, 984 F.2d 321, 324 (9th Cir. 1993) (holding that the denial of the plaintiff's federal habeas petition precluded his § 1983 lawsuit, even though he filed the § 1983 action first).

*Second*, Case 21-414 was resolved in a final judgment on the merits. Specifically, this Court held that Hedrington's lawsuit against the United States was barred by the FTCA's statute of limitations, 28 U.S.C. § 2401(b). *See* Frueh Decl. Ex. B (Order and Judgment in a Civil Case). "A 'dismissal on statute of limitations grounds is a judgment on the merits' that operates as res judicata." *Ruiz v. Snohomish Cnty. Pub. Util. Dist. No. 1*, 824 F.3d 1161, 1164 (9th Cir. 2016). Hedrington did not appeal the Court's judgment, and his motion for reconsideration was denied. *See* Frueh Decl. ¶ 8.

*Finally*, Case 21-414 and the instant action involve the same parties: Hedrington and the United States. Although the instant action is prosecuted by Hedrington's bankruptcy trustee, Hedrington and the trustee are in privity given the settlement agreement between them. *See* ECF 30 (Ex. A). And, in addition to this contractual privity, it is well established that "the trustee stands in the shoes of the debtor, and for purposes of res judicata . . . is in privy with the debtor as a successor to the debtor's interests, with respect to what property the debtor owns that, by reason of § 541(a), has become property of the estate." *In re Barkats*, No. 14-00053, 2019 WL 3934799, at *5 (Bankr. D.D.C. Aug. 16, 2019) (collecting authorities); *see also Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707 (9th Cir. 1986) (noting that "[t]he scope of section 541 is broad, and includes causes of action").[5]

---

[5] Counsel for the trustee also was well aware of Case 21-414 (*see* Frueh Decl. ¶¶ 3–6 & ECF 35), and he also acted as Hedrington's de facto attorney in the instant case (*see* ECF 30 (Ex. A); Frueh Decl.

MEM. OF POINTS & AUTHORITIES IN SUPP. OF
DEF. USA'S MOT. FOR DISMISSAL OR SUMM. J.

17

1

2

3

**C.     Even if this Court had jurisdiction, and even this action were not barred by res judicata, summary judgment must be granted in favor of the United States because there is insufficient evidence to support any negligence claim.**

A defendant moving for summary judgment "may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing'—that is, pointing out through argument—the absence of evidence to support plaintiff's claim." *Fairbank*, 212 F.3d at 532.  The plaintiff must then produce "significant probative evidence." *Summers*, 127 F.3d at 1152.  Conjecture, speculation, or evidence that is merely colorable is insufficient. *Fairbank*, 212 F.3d at 532; *Major League Baseball*, 542 F.3d at 310.

Here, there is no competent, probative evidence that Hedrington was assaulted—let alone that any averred assault resulted from the negligence of federal employees acting within the scope of their employment.  Hedrington has no recollection of an assault and merely assumes that a "clear" or "white" substance he allegedly found on his person was semen, even though there were standing orders for rectal suppositories (aspirin and Dulcolax) during his hospital stay, and he underwent at least one rectal examination, which typically involves the use of a lubricant. *See* Ferranti Decl. Ex. B (Report), at 55.  Further, Hedrington's inconsistent and bizarre narrative is wholly undermined by the significant, probative evidence showing he was experiencing postoperative delirium. *See id.* at 51–55.

At any rate, even if there were sufficient evidence to find that Hedrington was assaulted, there is no evidence that such assault resulted from federal employees who "negligently supervised and transported [him] to and from physical therapy and recovery," as alleged in the operative Complaint. *See* Compl. (ECF 1) ¶ 9.  Rather, by Hedrington's own account, he was under the direct supervision of DGMC personnel at all times relevant to his alleged assault. *See* Frueh Decl. Ex. E (Hedrington Dep.), at 65:20–82:17.  In turn, any purported sexual misconduct by those employees, or any averred failure to supervise them, are not actionable against the United States. *See supra* Sections IV.A.2–.4.

///

///

///

Ex. E (Hedrington Dep.), at 9:3–9:25), yet he failed to intervene or otherwise attempt to prevent Case 21-414 from reaching a preclusive final judgment.

Mem. of Points & Authorities in Supp. of
Def. USA's Mot. for Dismissal or Summ. J.

**V.      Conclusion**

For the foregoing reasons, this action must be dismissed for lack of subject-matter jurisdiction or, in the alternative, summary judgment must be granted in favor of the United States.

Dated: September 16, 2022                              Respectfully submitted,

                                                      PHILLIP A. TALBERT
                                                      United States Attorney

                                          By:     /s/  *Joseph B. Frueh*
                                                      JOSEPH B. FRUEH
                                                      Assistant United States Attorney

                                                      Attorneys for Defendant
                                                      UNITED STATES OF AMERICA

Mem. of Points & Authorities in Supp. of
Def. USA's Mot. for Dismissal or Summ. J.

19